**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| REHOBOTH PIPELINE CONSTRUCTION SERVICES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MARKWEST LIBERTY MIDSTREAM & RESOURCES, LLC,<br><br>Defendant. | Case No._____<br><br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

NOW COMES Plaintiff, Rehoboth Pipeline Construction Services LLC, by and through its attorney, Sean L. Ruppert, Esq. of Kraemer, Manes & Associates LLC, and files this Complaint alleging as follows:

### **I. Nature of the Action**

1. Plaintiff brings this Complaint to recover damages for Breach of Contract and Breach of Good Faith and Fair Dealing under Colorado Common Law. The Defendant Corporation entered into a Contractor Agreement with the Plaintiff. Defendant failed to perform duties required to achieve completion of the Agreement, and subsequently breached the terms of the Subcontractor Agreement, causing the Plaintiff to sustain monetary damages.

### **II. Jurisdiction and Venue**

2. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff, and its sole member, are residents and citizens of the Commonwealth of Pennsylvania. Defendants are residents and citizens of the State of Colorado. The amount in controversy exceeds $100,000.

3. Defendant is a residents and citizen of the State of Colorado. Therefore, this action is within the jurisdiction of the United States District Court for the District of Colorado and the venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

### III. Parties

4. Plaintiff, Rehoboth Pipeline Construction Services LLC ("Plaintiff"), is Pennsylvania limited liability company headquartered at 2296 Flint Dr., Washington, PA 15301. Plaintiff's sole member, Chris Walker, also resides at 2296 Flint Dr., Washington, PA 15301.

5. Defendant, MarkWest Liberty Midstream & Resources, L.L.C. ("MarkWest") is a Delaware limited liability company headquartered at 1515 Arapahoe St., Tower 1, Suite 1600, Denver, Colorado, 80202.

### IV. Facts

6. Plaintiff is a contracting company engaged in the business of oil and gas pipeline construction.

7. Defendant is a limited liability company engaged in the gathering, processing, and transportation of natural gas.

8. Prior to entering the bid process, Plaintiff engaged in negotiations with Defendant's Senior Construction Manager, Jim Walker. Mr. Walker informed Plaintiff that bids were required on four (4) separate spreads. Mr. Walker agreed with Plaintiff that Plaintiff would not be selected for spread 4, as it was the most difficult part of the project. However, Defendant required Plaintiff to bid bid on the entire project, not just spreads 1, 2, and 3. Defendant stated it was necessary for Plaintiff to bid on all four (4) spreads in order for it to have received enough bids for the project to commence.

9. Plaintiff further built into his bid, as is industry standard, pricing based upon who the specific inspectors assigned to project the would be. Defendant assured Plaintiff that a specific

inspector named Dave Sansonetti would not be assigned to any projects. Sansonetti had been an inspector on previous projects performed by Plaintiff's sole member, Chris Walker. Sansonetti had caused significant and unnecessary delays and cost overruns on those projects through inappropriate and incompetent actions. As a result of Defendant's assurances that more qualified inspectors would be employed, Plaintiff priced his bid on the project with the assumption that Sansonetti would not be an inspector on the project. Had Plaintiff been informed that Sansonetti would be an inspector on the project, he would have increased his bid by ten percent (10%), equaling $1,039,000.00., to account for the cost delays and increased costs that would surely be caused by Sansonetti's incompetent and inappropriate actions as inspector.

10. Subsequent to the bid process, Defendant assigned Plaintiff solely spread 4, despite explicit assurances that its bids would only be considered for work on spreads 1 through 3, and that its bid on spread 4 was merely a formality in order to get enough bids to begin the project.

11. Plaintiff, in good faith, and despite Defendant's previous false assurances, entered into contracting agreements with MarkWest to perform pipeline installation work on spread 4 on December 19th and 20th, 2017.

12. Plaintiff set forth a project start deadline of approximately mid-January 2018 and a contractual deadline for mechanical completion of June 1, 2018.

13. Upon arrival at the job site, Plaintiff was made aware the Inspector Dave Sansonetti was indeed assigned to his construction job, contrary to explicit assurances which affected pricing during the bidding process from Jim Walker.

14. Plaintiff expended significant resources in preparing for the project, and also avoided contracting for other projects during this time; thus, Plaintiff was forced to continue with the project in an attempt to fulfill the contract.

15. Shortly upon beginning the project, Plaintiff encountered difficulties with Inspector Sansonetti, to the point that he was forced to call a meeting with MarkWest leadership in mid-February.

16. The meeting, included Inspector Sansonetti, Jim Walker, Jeremiah Frederick as well as several other inspectors. Plaintiff gave multiple examples of issues with Inspector Sansonetti including, but not limited to:

   a. Sansonetti directing Plaintiff's drivers to transport "silt sock" to a different location than originally directed by Plaintiff, causing the driver to drive to a wrong location on unpermitted roads, while Plaintiff's workers and rented equipment were on standby for hours until the issue was resolved;

   b. Multiple employees informed Plaintiff that Sansonetti changed their course of action each day, and several times a day, as well as forced them to redo sections repeatedly without contacting Plaintiff about any issues. Plaintiff witnessed these meetings several times upon arriving at the work site;

   c. Sansonetti would routinely call long meetings with Plaintiff's employees to give detailed directions on how to do their job, causing Plaintiff to lose hours of employee work and rented equipment each day.

   d. Sansonetti routinely showed inexperience and lack of knowledge regarding methods Plaintiff's workers used to construct structures such as air bridges, and continued giving directives which cost Plaintiff hours of labor and costs.

17. At the conclusion of this meeting, Sansonetti was instructed by Defendant to cease directing Plaintiff's employees and merely observe and report. Plaintiff at this point had used 20% of budgeted-for labor costs, but completed 6% of the work due to Sansonetti's interference.

18. Afterwards, Sansonetti specifically asked employees of Plaintiff and Plaintiff's CEO, Chris Walker, for a $10,000.00 bribe in order to "make things go easier" on the job. Specifically, Sansonetti stated that his daughter's wedding was in June or July, he was approximately $10,000.00 short on funding for the wedding. Sansonetti further stated that he wasn't shy in asking, believed that other inspectors and contractors engaged in this behavior, and that the parties could work together to make life easier for the both of them. Plaintiff declined paying the $10,000.00 at this time. Plaintiff subsequently began experiencing increased delays and issues specifically due to Sansonetti's behavior.

19. During the construction process, Plaintiff also encountered numerous difficulties with regards to expected terrain and bore quality, despite assurances from Defendant to the contrary.

20. Specifically, Defendant withheld information about previous issues on an adjacent bore, known for approximately five (5) years. The bore location contained extraordinary inadvertent return "IR" issues, due to the porousness of the soil.

21. Had Defendant stated the accurate nature of the bore sites, Plaintiff's bid would have been priced significantly differently, as well as planned for entirely differently. Prior to beginning the job, Plaintiff presented a "mud program" which specifically addressed potential IR issues by using wood shavings and/or wood sawdust as a remedy. However, MarkWest Environmental Department employee Shannon Miles specifically, and falsely, stated that MarkWest's internal policies would not permit the use of such additives on the project.

22. Once work got underway, Plaintiff encountered the aforementioned IR issues. Plaintiff attempted to resolve IR issues by requesting to add natural additives to bore holes, specifically wood shavings and/or wood sawdust. Defendant, by way of Shannon Miles and Inspector Sansonetti, informed Plaintiff again that no additives were to be used.

23. Plaintiff was unable to meet the deadline for completion due to Defendant's failures to accurately detail terrain and bore quality prior to contract formation and due to Defendant's denial of Plaintiff's mitigation remedies.

24. MarkWest provided Plaintiff with an additional extension on the Project, which Plaintiff used to continue working in earnest and in good faith. All time extensions required were due to Defendants' misrepresentations.

25. Plaintiff subsequently was made aware that natural additives were indeed allowed to be used on bores.

26. Specifically, Plaintiff hired a subcontractor to drill a second bore located within spread 4. That driller went to the job site and gave Inspector Sansonetti plans which included the use of natural additives when an IR occurred. He was informed that no natural additives would be allowed on the project.

27. The driller then informed Sansonetti that he would have to remove all his equipment and be unable to perform the job, as additives would be necessary to complete the job.

28. Sansonetti advised the driller to avoid leaving the job until he could contact Defendant. Sansonetti contacted Shannon Miles at Defendant's environmental department. Ms. Miles informed the inspector that natural additives, specifically wood shavings as originally proposed by Plaintiff, had been approved for use on the bore sites throughout the duration of the project. That driller was subsequently allowed to use wood shavings on the bore.

29. Plaintiff then reached out to Jim Walker to inform of the false assertions regarding wood shavings, and to inform him that this had cost his company millions of dollars. Plaintiff then contacted Inspector Jeremiah Frederick about the wood shavings, and was flatly denied. He was told that he "cried to Jim" about the shavings issue, and that "now, you don't get to use them."

30. Defendant's failure to allow Plaintiff to use additives for bore issues, despite repeated requests to attempt to mitigate the IR issues, caused Plaintiff excessive and unnecessary delays, through no fault of Plaintiff.

31. Additionally, during construction, Plaintiff encountered an underground spring, which incurred costs of $600,000.00 for storage, hauling, and proper disposal. Defendant, by way of Senior Construction Manager Jim Walker, agreed verbally to cover these entire costs. However, Defendant only covered $80,000.00 in costs.

32. Defendant ultimately approved the Plaintiff's of natural additives, however Plaintiff was removed from the job prior to being able to employ them.

## COUNT I
### Breach of Contract

33. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

34. The Agreement is a binding legal instrument that creates mandatory obligations on the part of Defendant.

35. Section 7.1 of the Agreement states "To **Company's** knowledge, all relevant information in **Company's** possession or control concerning the physical condition of the Property and/or the general subject matter of the Work has been made available to **Contractor**" (emphasis in original).

36. Defendant breached its contractual obligations to Plaintiff by purposefully concealing relevant information which the Plaintiff would not have been able to ascertain on his own, including, but not limited to the IR issues on the adjacent bore site, during negotiation of the Agreement, and then terminating the Agreement prior to completion.

37. As a proximate result of Defendants' breach, Plaintiff has sustained damages.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in its favor, and against the Defendants, and award all damages available at law and in equity, in excess of $100,000.00, and including: compensatory damages, court costs, attorney fees, pre-judgment and continuing interest, and any other relief that the Court deems necessary and proper.

## COUNT II
### Breach of Duty of Good Faith and Fair Dealing

38. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

39. Defendant had a duty to maintain Good Faith and Fair Dealing to Plaintiff.

40. Defendants breached its duty of Good Faith and Fair Dealing to Plaintiff by:

   a. Concealing its knowledge of the IR issues during negotiations;

   b. Encouraging Plaintiff to reduce its bid while concealing information regarding the previous IR issues on an adjacent bore;

   c. Refusing to allow Plaintiff to mitigate the issues by use of natural additives; and

   d. Accepting a bid which MarkWest knew would result in significant monetary loss to the Plaintiff.

41. Defendants further breached duty of Good Faith and Fair Dealing to Plaintiff by subsequently terminating the Agreement despite Plaintiff's best efforts to fulfill its obligations.

42. As a proximate result of Defendants' breach, Plaintiff has sustained damages.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in its favor, and against the Defendants, and award all damages available at law and in equity, in excess of $100,000.00, and including: compensatory damages, court costs, attorney fees, pre-judgment and continuing interest, and any other relief that the Court deems necessary and proper.

## COUNT III
### Fraudulent Misrepresentation

43. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

44. Defendant, in negotiating with Plaintiff prior to bid proposals, made and/or failed to make material representations regarding job site quality and previous IR issues.

45. These representations were false, as the actual quality of the job site required significantly different preparations.

46. Plaintiff believes, and therefore avers, that Defendant made these representations at a time when the falsity of these representations were known by Defendant.

47. Plaintiff believes, and therefore avers, that Defendant made these representations with the intention that Plaintiff rely on these misrepresentations in calculating its bid proposal.

48. Plaintiff did in fact rely on these representations in calculating its bid proposal.

49. Defendant encourage Plaintiff to submit a low bid based upon these representations.

50. As a result of relying on Defendant's misrepresentations, Plaintiff suffered damages.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in its favor, and against the Defendants, and award all damages available at law and in equity, in excess of $100,000.00, and including: compensatory damages, court costs, attorney fees, pre-judgment and continuing interest, and any other relief that the Court deems necessary and proper

## COUNT IV
### Negligent Hiring

51. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

52. Companies have a duty to use reasonable care in choosing an independent contractor who is properly qualified to perform the work.

53. Defendant was aware, or should have been aware, that Sansonetti performed inspections in a manner which was incompetent, careless, and corrupt.

54. Defendant was thus negligent in its retention of Sansonetti to perform inspections as an independent contractor.

55. Sansonetti performed the duties for which he was contracted by Defendant in an incompetent, careless, and corrupt manner.

56. Examples of Sansonetti's incompetent, careless, and corrupt actions include:

   a. Sansonetti directing Plaintiff's drivers to transport "silt sock" to a different location than originally directed by Plaintiff, causing the driver to drive to a wrong location on unpermitted roads, while Plaintiff's workers and rented equipment were on standby for hours until the issue was resolved;

   b. Multiple employees informed Plaintiff that Sansonetti changed their course of action each day, and several times a day, as well as forced them to redo sections repeatedly without contacting Plaintiff about any issues. Plaintiff witnessed these meetings several times upon arriving at the work site;

   c. Sansonetti would routinely call long meetings with Plaintiff's employees to give detailed directions on how to do their job, causing Plaintiff to lose hours of employee work and rented equipment each day.

   d. Sansonetti routinely showed inexperience and lack of knowledge regarding methods Plaintiff's workers used to construct structures such as air bridges, and continued giving directives which cost Plaintiff hours of labor and costs.

  e. Sansonetti asked a subcontractor of the Plaintiff, and Plaintiff's CEO, Chris Walker, for a $10,000.00 bribe in order to "make things go easier" on the job site. Specifically, Sansonetti stated that his daughter's wedding was in June or July, he was approximately $10,000.00 short on funding for the wedding. Sansonetti further stated that he wasn't shy in asking, believed that other inspectors and contractors engaged in this behavior, and that the parties could work together to make life easier for the both of them. Plaintiff declined paying the $10,000.00 at this time. Plaintiff subsequently began experiencing increased delays and issues specifically due to Sansonetti's behavior.

57. As a result of the Defendant's negligent hiring of Sansonetti, Plaintiff has sustained, and continues to sustain damages.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in its favor, and against the Defendants, and award all damages available at law and in equity, in excess of $100,000.00, and including: compensatory damages, court costs, attorney fees, pre-judgment and continuing interest, and any other relief that the Court deems necessary and proper.

## COUNT V
## Breach of Contract

58. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

59. During construction, Plaintiff encountered an underground spring.

60. Encountering the spring caused Plaintiff to incurr costs of $600,000.00 for removal, storage, hauling, and proper disposal.

61. Defendant, by way of Senior Construction Manager Jim Walker, agreed verbally to cover all costs incurred by Plaintiff as a result of the spring.

62. This verbal agreement constitutes a contract, separate and apart from the written agreement governing the project.

63. Plaintiff carried on business and budgeted the rest of the project under the assumption that Defendant would fulfill the agreement and reimburse the full cost of the removal, storage, hauling, and disposal of the spring water.

64. However, Defendant only covered $80,000.00 in costs related to the spring.

65. Defendant's failure to pay all costs incurred as a result of the spring constitute breach of contract.

66. Plaintiff has suffered, and continues to suffer, economic damages as a result of the Defendant's breach.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in its favor, and against the Defendants, and award all damages available at law and in equity, in excess of $100,000.00, and including: compensatory damages, court costs, attorney fees, pre-judgment and continuing interest, and any other relief that the Court deems necessary and proper.

### COUNT VI
**Promissory Estoppel**
*(in the alternative to Count V)*

67. The averments contained in paragraphs 1 though 57 are incorporated herein as though set forth at length.

68. During construction, Plaintiff encountered an underground spring.

69. Encountering the spring caused Plaintiff to incur costs of $600,000.00 for removal, storage, hauling, and proper disposal.

70. Defendant, by way of Senior Construction Manager Jim Walker, promised to cover all costs incurred by Plaintiff as a result of the spring.

71. In reliance on this promise, Plaintiff carried on business and budgeted the rest of the project under the assumption that Defendant would fulfill its promise and reimburse the full cost of the removal, storage, hauling, and disposal of the spring water.

72. It was reasonable for the Plaintiff to rely on this promise because Defendant, as an experienced contractor, would know that the Plaintiff would budget its project very differently as a result.

73. Defendant knew, or should have known as an experienced contractor, that the Plaintiff would rely on this promise, as it was well aware of the relative costs and the Plaintiff's budgetary concerns.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in its favor, and against the Defendants, and award all damages available at law and in equity, in excess of $100,000.00, and including: compensatory damages, court costs, attorney fees, pre-judgment and continuing interest, and any other relief that the Court deems necessary and proper.

## COUNT VII
### Unjust Enrichment
*(in the alternative to Count V)*

74. The averments contained in paragraphs 1 though 57 are incorporated herein as though set forth at length.

75. During construction, Plaintiff encountered an underground spring.

76. Encountering the spring caused Plaintiff to incur costs of $600,000.00 for removal, storage, hauling, and proper disposal.

77. Defendant, by way of Senior Construction Manager Jim Walker, represented that it would to cover all costs incurred by Plaintiff as a result of the spring.

78. In reliance on this representation, Plaintiff carried on business and budgeted the rest of the project under the assumption that Defendant would fulfill its promise and reimburse the full cost of the removal, storage, hauling, and disposal of the spring water.

79. It was reasonable for the Plaintiff to rely on this representation because Defendant, as an experienced contractor, would know that the Plaintiff would budget its project very differently as a result.

80. Defendant, as an experienced contractor, knew, or should have known, that the Plaintiff would rely on this representation, as it was well aware of the relative costs and the Plaintiff's budgetary concerns.

81. Defendant's received the benefit of the Plaintiff's work in removing, storing, hauling, and disposing of the spring.

82. Defendant failure to pay such costs associated with this work constitutes unjust enrichment.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in its favor, and against the Defendants, and award all damages available at law and in equity, in excess of $100,000.00, and including: compensatory damages, court costs, attorney fees, pre-judgment and continuing interest, and any other relief that the Court deems necessary and proper.

Respectfully Submitted,

/s/ Sean L. Ruppert

PA ID: 314380

**KRAEMER, MANES & ASSOCIATES LLC**
US Steel Tower, 48th Floor
600 Grant St, Suite 4875
Pittsburgh, PA 15219
(412) 626-5550 Direct
sr@lawkm.com